UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHIMA JAMES,

    Plaintiff,

v.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON, et al.,

    Defendants.

_____/

CASE NO. 1:12-CV-1361

HON. ROBERT J. JONKER

## OPINION

Plaintiff, Ashima James, brings this action for long-term disability benefits against Defendants Liberty Life Assurance Company of Boston ("Liberty") and DTE Energy Company Welfare Benefit Plan under 29 U.S.C. § 1132(a)(1)(B), a civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"). Liberty has filed a motion for judgment on the record (docket #25). For the reasons set forth below, the Court will grant James long-term disability benefits under the two-year "regular occupation" coverage retroactive to February 24, 2012. The Court declines to address questions regarding potential qualification under the "any occupation" coverage, and potential application of the "mental health symptoms" rider because these issues will not be ripe before February 24, 2014, and may involve a different, or at least expanded, administrative record.

# I. Factual Background

James is an approximately fifty-five-year-old woman who worked as a buyer for DTE Energy until August 2011, when she began disability leave because of injuries from a car accident. (Compl., docket #1, at 3; docket #18-2, at 123).[1] As a buyer, James's job naturally required a degree of consistent and focused mental engagement. From a physical point of view, the job consisted of carrying out procurement operations, writing contracts, and negotiating contract terms, and is classified as a "sedentary and light physical demand" occupation. (Docket #18-2, at 113; #18-5, at 282.) As a DTE employee, James was insured under the DTE Group Disability Income Policy ("Policy") issued by Liberty. (*See* docket #18-1, at 65–106.)

## A. Key Policy Provisions

The Policy has an elimination period during which long-term benefits are not payable under the policy. (*Id.* at 69.) During the first 24 months following the elimination period, the Policy defines "disability" as the inability to "perform the Material and Substantial Duties of [the Covered Person's] regular occupation or any other occupation with the company for which the Covered person is qualified and which is offered at not less than [his or her] current rate of pay." (*Id.* at 73.) Beyond 24 months, the Policy defines "disability" as the inability "to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (*Id.*) "Any Occupation" is "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical, and mental capacity" to perform. (*Id.* at 72.) The Policy requires proof of disability. (*Id.* at 84.) According to the Policy:

---

[1] The Administrative Record (AR) consists of CM/ECF docket numbers 18–21. The page numbers refer to the CM/ECF Page ID numbers, not the internal "LL" pagination.

> "Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:
> 1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;
> 2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's Physician; and
> 3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays, and/or other forms of objective medical evidence in support of a claim for benefits.

(*Id.* at 76.)

### B.     The Car Accident

On August 4, 2011, James was a passenger in a vehicle rear-ended by a truck traveling approximately 40 to 45 miles per hour. (Docket #18-5, at 300; 19-3, at 373.) She was taken to an emergency room and evaluated. (Docket #18-5, at 294.) She experienced right arm and back pain and exhibited a limited range of motion. (Docket #18-4, at 227.) X-rays did not reveal any fractures. (Docket #18-5, at 298.)

### C.     Treating Physicians

The following day, James saw her primary care physician, Dr. Robert Chang, board-certified in internal medicine, who advised her to not work for at least two weeks due to "strain of the thoracic spine and chest wall, contusions and strain." (Docket #21-3, at 885.) Thoracic spine x-rays were negative. (*Id.*) Dr. Chang referred James to Dr. Thomas Nabity, board-certified in physical medicine and rehabilitation, who examined James on August 22, 2011. (Docket #19-3, at 373–74.) Dr. Nabity documented right shoulder pain with limited range of motion and a possible rotator cuff tear, thoracic myofascial pain, and acute anxiety attacks. (*Id.*) He recommended a physical therapy program with the possibility of future trigger point injections for pain, magnetic resonance imaging (MRI) of the rotator cuff, and a formal neuropsychological evaluation. (*Id.* at 374.) An MRI taken

3

August 28, 2011 revealed a right shoulder labral tear and supraspinatus tendonitis. (*Id.* at 377.) An MRI taken October 4, 2011 documented cervical degenerative arthritis "with moderate to severe foraminal stenosis" and "mass effect on the cord." (*Id.*) Drs. Chang and Nabity continued to examine and treat James during her disability leave. James was also referred to various specialists, including Dr. Cheryl Mazzara, a board-certified psychiatrist. (*See id.* at 392.) Dr. Mazzara diagnosed James with Major Depressive Disorder, Recurrent, Severe Without Psychotic Features (DSM-VI 296.33) and Generalized Anxiety Disorder (DSM-IV 300.02). (Docket #19-4, at 404, 406.)

      D.      **Independent Medical Examinations**

During the elimination period, DTE paid James's short-term disability benefits without objection. (See Docket #21-5, at 962.) At DTE's request, two doctors conducted independent medical examinations (IMEs) of James. First, on October 11, 2011, Dr. Shlomo Mandel, board-certified in occupational, internal, and environmental medicine, interviewed and examined James. (Docket #19-5, at 458–71.) His examination revealed tenderness in the paracervical and trapezius region, "very limited" range of motion of the cervical spine with significant decreases in flexion, extension, rotating, and side bending bilaterally. (*Id.* at 466.) He noted that the examination was "remarkable for extensive subjective difficulty, with very little range of motion of the shoulder and essentially no grip measured in the right compared to left upper extremity." (*Id.* at 468.) Dr. Mandel concluded in his report that while there were "a great deal of subjective findings," there was "no objective indication of orthopedic pathology or focal neurological deficits." (*Id.* at 469.) He opined that James's prognosis was "fair" and James could return to work without limitation as a DTE buyer. (*Id.*)

4

On October 19, and again on December 7, 2011, Dr. Saul Forman, a psychiatrist, interviewed and examined James. (*Id.* at 473–83.) In his first report, Dr. Forman diagnosed James with Posttraumatic Stress Disorder, Acute, with Depression (DSM-IV 309.81). (Docket #21-1, at 775.) He recorded her self-reports of feeling helpless, hopeless, and worthless with some "disordered thinking," but noted that she was not suicidal or paranoid. (*Id.* at 773.) He also observed that she became "preoccupied" when Dr. Forman talked about returning to work. (*Id.* at 774.) In his first report, Dr. Forman concluded that, from a psychiatric perspective, James could return to work without restriction. At a second examination, Dr. Forman administered a Beck Depression Inventory test. (*Id.* at 752.) In his second report, he recorded James's self-reports of depression, one occasion of suicidal thoughts, and increased anxiety. (*Id.* at 752–53.) He also observed that she appeared "sad, isolated and withdrawn." (*Id.* at 751.) He diagnosed her with Mood Disorder Due to General Medical Condition with Severe Depression (DSM-IV 293.83) and Major Depressive Disorder, Single Episode (DSM-IV 296.1), in addition to Posttraumatic Stress Disorder. (*Id.* at 753.) He concluded, "I do not find her able to return to work at this time," and recommended continued mental health treatment. (*Id.* at 754.)

E.     **File Reviews and Initial Decision Denying Long-term Benefits**

When James initially went on short-term disability leave, DTE paid James short-term disability benefits. (Docket #21-5, at 962.) On February 24, 2012, James became eligible for long-term disability benefits. (*Id.*) On March 2, 2012, Liberty informed James that her claim for long-term benefits was denied because James had not submitted sufficient proof that she was disabled within the meaning of the Policy. (Docket #20-2, at 586-90.) Liberty supported its decision with reports from two doctors who conducted file reviews, but did not personally examine James.

5

First, Dr. Jaime Foland, board-certified in physical medicine and rehabilitation, conducted a file review. (Docket #20-3, at 614.) He acknowledged James's diagnosis of myofascial pain syndrome, the MRI of her right shoulder showing a labral tear and mild supraspinatus tendinitis, and the MRI of her spine showing moderate to severe foraminal stenosis. (*Id.* at 610.) He also acknowledged ongoing self-reported anxiety. (*Id.*) He then concluded that James could return to work with the restrictions that she only lift/carry up to 10 pounds and discontinue activities above shoulder-level with her upper right extremity. (*Id.* at 613.)

Second, Dr. Thomas Gratzer, board-certified in forensic psychiatry, conducted a file review from a psychiatric perspective. (*Id.*) Dr. Gratzer reviewed Dr. Mazzara's psychiatric diagnoses for depression and anxiety, but observed that Dr. Mazzara recommended that James remain off work predominantly due to physical, not psychiatric, conditions. (*Id.* at 608.) Dr. Gratzer also reviewed Dr. Forman's report and medical opinion that James was not able to return to work because she was psychiatrically impaired. (*Id.* at 609.) Dr. Gratzer discredited Dr. Forman's opinion because it was largely based on the results of the Beck Depression Inventory test, a self-reporting inventory, rather than an objective measure. (*Id.*) Dr. Gratzer then concluded that James was not psychiatrically impaired or restricted from returning to work. (*Id.* at 612.)

F.   **Administrative Appeal**

On August 22, 2012, James filed an administrative appeal. (Docket #19-5, at 484.) James attached updated records from Dr. Chang, Dr. Nabity, and notes from two additional providers, Dr. Christine Liff and Dr. Violette Henein.

First, Dr. Liff, a neuropsychologist, conducted a neuropsychological evaluation of James on June 5, and July 2, 2012. (Docket #18-5, at 286-92.) Liff observed James's inability to effectively

6

cope with and manage day-to-day functioning, but otherwise documented "grossly intact cognitive functioning." (*Id.* at 292.) Dr. Liff noted that the results contradicted James's self-report of memory problems and that her performance appeared to be affected by non-neurological factors, such as "considerable pain and physical discomfort during the clinical interview" and psychological distress. (*Id.* at 291.) Dr. Liff diagnosed James with "Adjustment Order with Mixed Anxiety and Depressed Mood Pain Disorder." (*Id.*)

Second, Dr. Henein, a rheumatologist, evaluated and treated James twice from May to June 2012. (Docket #19-5, at 448.) She diagnosed James with inflammatory arthritis, objectively documented by blood test results. (*Id.*) She noted upon physical examination that the spine did not exhibit myofascial trigger points and the spine and shoulder had full range of motion without pain. (*Id.* at 449.)

### G. Additional File Reviews

Upon James's appeal, Liberty solicited two additional file reviews. First, Dr. Sarah Deland, board-certified in psychiatry and neurology, reviewed James's file from a psychiatric perspective. (Docket #18-3, at 154–62.) Dr. Deland exchanged messages with Dr. Mazzara, James's treating psychiatrist, who reported that James's "primary disability is medical, not psychiatric" and, although she had not been the doctor recommending that James should not work, she agreed that James could not work. (*Id.* at 163.) Dr. Deland disagreed, opining that although James exhibited a "depressed mood, anxiety, poor sleep, and feelings of worthlessness because of an inability to work," resulting from pain that had "reportedly significantly impacted her way of life," James did not have any cognitive deficits and her condition was not a disabling psychiatric impairment. (*Id.* at 161.)

7

Second, Dr. Steven Lobel, board-certified in physical medicine and rehabilitation/pain medicine, reviewed James's file. (*Id.* at 153.) He noted James's diagnoses and treatment history, opining that self-reported pain in the neck and shoulders was "reasonable given the [MRI] imaging." (Docket #18-3, at 151.) He disagreed with James's treatment plan, stating that, in his opinion, repeat epidural injections were experimental and posed risks that outweighed the benefits. (*Id.* at 151–52.) He suggested that a medication for fibromyalgia syndrome—which "appear[ed] to be a more valid diagnosis" from his perspective—would have been a better treatment option. (*Id*. at 152.) He also observed that James provided inconsistent self-reports of pain. (*Id.*) Finally, after observing that James's diagnosis of rheumatoid arthritis was beyond his expertise, he concluded that James's inconsistent self-reports and the lack of documented neurological deficits advised that work restrictions were not warranted. (*Id.*)

H.     **Denial of Administrative Appeal**

On November 19, 2012, Liberty denied James's appeal, noting the lack of objective evidence that James's conditions precluded her from performing her job. (Docket #18-2, at 135.) The denial letter did not address James's arthritis diagnosis, as it was beyond the scope of Dr. Lobel's expertise. On November 26, 2012, Dr. Nabity responded to Liberty's denial letter. (*Id*. at 129.) He explained that the MRI findings directly correlated with a shoulder injury and the accident as the cause of the injury, emphasizing that it resulted in a "significant restriction." (*Id*.) He opined that the combination of severe cervical stenosis, resulting in cervical myofascial pain and cervicogenic headaches, rheumatoid arthritis, and "concurrent psychological illnesses" impeded James from performing her job. (*Id*. at 129–30.) Liberty responded that it would not consider Dr. Nabity's letter because James had exhausted her right of appeal and her file was closed. (*Id*. at 125.) James filed

8

this lawsuit on December 13, 2012. The Court heard oral argument on Liberty's motion for judgment on the record on September 19, 2013, and the case is ready for decision.

**II. Legal Standard**

ERISA regulates, among other things, employee welfare benefit plans that provide insurance benefits in the event of disability. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009). "ERISA permits a participant or beneficiary to bring a civil action (1) 'to recover benefits due to him under the terms of his plan,' (2) 'to enforce his rights under the terms of the plan,' or (3) 'to clarify his rights to future benefits under the terms of the plan.'" *Id.* (quoting 29 U.S.C. § 1132(a)(1)(B)). The parties agree that this action should be resolved under the procedural guidelines set out in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998). Under *Wilkins*, the Court determines the applicable standard of review and whether the material in the administrative record supports the denial of benefits under the applicable standard of review. 150 F.3d at 613, 616–19.

Courts ordinarily review de novo an ERISA plan administrator's decision to deny benefits. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (citing *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659–60 (6th Cir. 1998)). However, where the ERISA plan grants a plan administrator discretionary authority to determine eligibility for benefits or to construe the plan terms, the Court reviews the denial of benefits under the "highly deferential arbitrary and capricious standard of review." *Id.* Nonetheless, in 2007, the Michigan Office of Financial and Insurance Services (OFIS), under its authority to regulate insurance, promulgated rules prohibiting insurers from issuing, delivering, or advertising insurance contracts or policies that contain discretionary

clauses giving deference to plan administrators. *Am. Council of Life Insurers*, 558 F.3d at 602 (citing Mich. Admin. Code R. 500.2201–500.2202 and 500.111–550.112). The Sixth Circuit has held that ERISA does not preempt state administrative rules that prohibit discretionary clauses. *Id.* at 608–09. In effect, Rule 500.2202 voids discretionary clauses in insurance policies issued after June 1, 2007, thus requiring a reviewing court to apply a de novo standard of review. *See id.* at 603, 609.

In this case, the parties agree that Rule 500.2202 applies to the Policy, and the applicable standard of review is de novo. Where the de novo standard applies, the role of the reviewing court is to determine whether the denial of benefits was the "correct decision." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). The court must review the "record before the administrator" without granting "deference . . . or any presumption of correctness" to the administrator's determination. *Id.* The de novo standard of review "applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins*, 150 F.3d at 613. A court should not hear or consider evidence not presented to the plan administrator in connection with a claim. *Perry*, 900 F.2d at 966. Indeed, a court must "simply decide[] whether or not it agrees with the decision under review." *Id.*

### III. Discussion

The preponderance of evidence in the administrative record supports that James was disabled from performing her regular occupation. The record evidence consists of an emergency room examination and x-rays, physical examination and chart notes from Dr. Chang, physical examinations and chart notes from Dr. Nabity spanning August 2011 to July 2012, a physician statement of disability from Dr. Nabity dated August 15, 2012, MRIs of James's shoulder and spine,

treatment notes from Dr. Mazzara, IME reports from Drs. Mandel and Forman, results of the Beck Depression Inventory test administered by Dr. Forman, file review reports from Drs. Foland, Gratzer, Deland, and Lobel, treatment notes and results from a neuropsychological evaluation administered by Dr. Liff, and a physical examination and chart notes from Dr. Henein. Most salient are the following aspects of the medical record: (1) The record includes objective findings of a labral shoulder tear and cervical degenerative arthritis immediately following James's car accident; (2) Dr. Mandel's IME confirmed James's limited range of motion of the spine and shoulder and essentially no grip strength in the right compared to left upper extremity; (3) no medical professional who actually treated James opined that she was able to work; (4) one of the two IME examiners agreed that James was disabled; and (5) the file reviewing doctors justified their conclusions of no disability only by discrediting or ignoring James's subjective evidence and, in some cases, despite noting objective findings consistent with the subjective reports of pain.

### A. Preponderance of the Evidence

The administrative record includes both subjective and objective evidence of the degree of impairment resulting from James's car accident. The record contains extensive subjective evidence of James's ongoing physical pain, and subjective evidence of the effect of physical pain on James's mental health. The record also includes objective medical evidence consistent with the subjective reports. This objective medical evidence includes MRI results showing a right shoulder labral tear, supraspinatus tendonitis, and degenerative arthritis. Even one of Liberty's file reviewers (Dr. Lobel) agreed the reports of pain were "reasonable given the [MRI] imaging." Finally, the record includes hybrid evidence that involves both subjective and objective components. The Beck Depression Inventory, for example, draws on a patient's self-reports, but is nevertheless a recognized

11

psychological or psychiatric instrument used to assess the severity of a patient's depression. It was the results of this Inventory that led one of the IME examiners to agree with James's treaters that James was, in fact, disabled. Similarly, the Policy expressly recognizes "chart notes" as a form of "objective medical evidence" and makes no distinction between a chart note reporting a patient's description of symptoms and a chart note recording a measurable condition, such as blood pressure or temperature. The "chart notes" as a whole consistently document James's mental and physical struggles with pain. In the context of all record evidence, a preponderance of the evidence supports a finding of disability from James's regular occupation.

Most weighty are the opinions of Drs. Nabity and Mazzara, James's most frequently treating physicians. The Court affords those opinions the most weight because, as treating physicians, Drs. Nabity and Mazzara were in the best position to observe changes in James's symptoms and assess potential malingering. Moreover, given their extended exposure to James, they could best observe her ability to cope with her symptoms. Although the Sixth Circuit has unequivocally stated that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), the court has also approved assigning more weight to a treating physician than a record reviewer who did not conduct an in-person examination, *see Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 806 (6th Cir. 2002) ("The evidence presented in the administrative record did not support the denial of benefits when only Provident's physicians, who had not examined Hoover, disagreed with the treating physicians."). "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty*

*Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.")[2] In the context of mental health conditions, many courts have expressed skepticism about claim denials in psychiatric disability cases that rely solely on file reviews because the reviewing doctors have not spent time evaluating the claimant. *See, e.g.*, *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp. 2d 856, 873–74 (E.D. Tenn. 2006), *vacated in part on other grounds by* 275 F. App'x 495 (6th Cir. 2008); *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *4 (W.D.N.Y. June 21, 2006) ("Because a psychiatric opinion that is based solely on a review of medical records is inherently less reliable than an opinion based on a face-to-face examination, it is an abuse of discretion to rely solely on such opinions, particularly in a case such as this, where the opinion of every physician who actually examined the plaintiff agreed that the plaintiff is disabled.").

Therefore, in this case, the Court assigns more weight to James's treating physicians, who are unanimous in their conclusion of disability. Dr. Nabity opined that diagnostic testing and physical examination supported that James's cervical stenosis could "certainly result" in the cervical myofascial pain and cervicogenic headaches complained of by James. (Docket #18-2, at 127.) He also opined that James's concurrent psychological illnesses, combined with her physical pain, rendered her incapable of performing her job duties. (*Id*.) Dr. Mazzara opined that, although James's predominant disability was physical, not psychiatric, James was disabled from her

---

[2]While the arbitrary and capricious standard does not apply in this case, the Court finds the case law persuasive in evaluating the evidence. *See Pierzynski*, 2012 WL 3248238, at *4.

occupation. (Docket 18-3, at 159.) As noted, these conclusions are fully supported by the record as a whole.

The conclusions of the IME examiners, Drs. Mandel and Forman, also were based in part on a personal examination of James. Their examinations were conducted in late 2011, while Drs. Nabity and Mazzara provided ongoing treatment and submitted updated medical opinions in late 2012. Even so, the IME examiner who saw James twice (rather than only once) ultimately agreed that James was disabled. Dr. Forman examined James from a psychological perspective, and, after administering a Beck Depression Inventory test, determined that James's psychological condition was disabling. Dr. Forman based his opinion on Beck test results, his interview observations (she appeared "sad, isolated and withdrawn," docket #21-1, at 751), and James's self-reports. Dr. Forman's conclusion, which appears to support a determination of disability based on James's psychological condition alone, actually goes further than Dr. Mazzara's opinion, and is certainly consistent with a finding of disability.

Dr. Mandel was the IME examiner who examined James for physical pain. He documented tenderness to light palpation in the paracervical and trapezius region but identified no other trigger points. He also observed a limited range of motion of the cervical spine and significant decrease in flexion, extension, rotation, and side bending bilaterally. He acknowledged "a great deal of subjective findings" but concluded that due to a lack of objective indication of orthopedic pathology or focal neurological deficits, James's prognosis was fair and she could return to work without limitation. (Docket #19-5, at 469.) Essentially, Dr. Mandel's opinion discredited all subjective findings and relied solely on objective findings, which he judged insufficient to support disability.

Therefore, his opinion is entitled to less weight because he dismissed well-documented subjective evidence.

Entitled to even less weight are the file reviews by Drs. Foland, Gratzer, Lobel, and Deland. Each of the reviewers only purported to evaluate James's file from a purely physical pain or psychiatric perspective, not both. Each of the reviewers acknowledged subjective reports of extensive, chronic pain but discredited the subjective reports as unsupported by objective evidence. Dr. Lobel's report, for example, appears to acknowledge the extent of James's pain but still recommends a return to work without limitation. In the course of stating his disagreement with Dr. Nabity's treatment plan, Dr. Lobel stated that fibromyalgia syndrome was probably a more valid diagnosis for James and recommended that she begin an approved fibromyalgia medication. Beyond his disagreement with epidural injections, Dr. Lobel implicitly agreed that James was experiencing extensive pain. He declined to consider the combined effects of James's rheumatoid arthritis, because it was beyond the scope of his expertise, and concluded that work restrictions were not supported by the objective evidence. Dr. Lobel's only other apparent basis for discrediting James's subjective reports and Dr. Nabity's opinion was a conclusory statement that James provided "varied" self-reports in providing "a different history of present illness to different providers." (Docket #18-2, at 152.) Dr. Lobel did not provide examples of where in the record James made contradictory statements about her symptoms, nor are any significant examples apparent in the record. Moreover, some variation in self-reports to different providers is not unexpected, given James's complicated, interrelated physical and psychiatric conditions, which improved at times with various treatments but still presented ongoing impairment. Thus, the reports by the four file reviews are entitled to less weight and certainly do not displace the preponderance of the evidence indicating disability.

Taken together, a preponderance of the evidence supports that James cannot perform her regular occupation and is disabled within the meaning of the "regular occupation" coverage of the Policy.

**B.      Liberty's Arguments**

*1.      Subjective versus objective evidence*

Liberty defends its denial of long-term disability benefits on its conclusion that James lacked objective evidence of a disabling condition.  The argument fails both legally and factually.

Liberty cites the Policy's definition of "proof" for the proposition that James must furnish objective evidence of her inability to perform her occupation in order to qualify for long-term disability benefits.  However, the Policy does not require exclusively objective evidence.  Rather, the policy states that "proof" "means the evidence in support of a claim for benefits and *includes, but is not limited to,* [the following medical evidence]." (Docket #18-1, at 76 (emphasis added).) The definition goes on to offer examples of proof, including "chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits." (*Id.*) This definition does not require all evidence to be objective; it simply includes "objective medical evidence" as one category of "proof."  Other courts considering this issue have held it unreasonable to reject a claimant's self-reported evidence where the plan administrator has no basis for believing it is unreliable, and where the ERISA plan does not limit proof to "objective" evidence. *See, e.g.*, *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, at 563 (W.D. Penn. 2009) (surveying cases); *see also Pierzynski v. Liberty Life Assurance Co. of Boston*, No. 10-14369, 2012 WL 3248238, at *4 (E.D. Mich. Aug. 8, 2012) (interpreting identical plan language and concluding that the plan administrator was "obligated to take into account Plaintiff's subjective complaints of pain

. . . something that it did not do when it chose a file review over a physical examination of Plaintiff."). Thus, in weighing the evidence, the Court considers both Plaintiff's subjective and objective evidence.

Moreover, this is not a case, in any event, that lacks objective evidence. To the contrary, there is objective evidence that corroborates the self-reports of pain and depression. Regarding physical pain, the corroborating evidence includes MRIs, Dr. Nabity's physical examinations and his assessment that the pain is consistent with the MRIs and physical examination, and chart notes from Drs. Nabity and Chang. Regarding psychiatric symptoms, Dr. Forman's objective observations and examination of James corroborate James's self-reports. The results of the Beck Depression Inventory, which is best characterized as a hybrid of objective and subjective evidence, also supports a finding of disability.

### 2. *Comorbid Diagnosis*

The basis of James's disability claim is that she has a comorbid diagnosis of myofascial pain and cervical degenerative arthritis with moderate to severe stenosis, complicated by depression and anxiety. As such, the principal weakness of Liberty's evidence against disability is that the doctors who reviewed James's file did so from either a physical pain/rehabilitation perspective or a psychological perspective, not both. By contrast, Drs. Nabity and Mazzara offered more nuanced opinions that James's disability arose from predominantly physical pain, complicated by her psychological diagnoses. Dr. Gratzer, for example, who reviewed James's file from a psychiatric perspective, observed Dr. Mazzara's opinion: "Dr. Mazzara appears to be finding Ms. James disabled on the basis of her physical, not psychiatric condition. I would note that this is outside of my area of expertise." (Docket #20-3, at 608.) Precisely because James's disability claim is

comorbid—and neither her physical nor psychological impairments, standing alone, are disabling—the Court assigns less weight to evidence reviewing James's condition from purely a physical or psychiatric perspective.

## IV. Relief

James brought this claim for benefits under ERISA section 502(a)(1)(B), which allows a plan participant or beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The principal relief under this section is an order reinstating benefits and awarding retroactive benefits. *See, e.g.*, *Glenn v. MetLife*, 461 F.3d 660, 675 (6th Cir. 2006). As such, the Court will grant James long-term disability benefits retroactive to February 24, 2012, James's first date of long-term disability benefit eligibility.

### A. "Any Occupation" Definition of Disability

Liberty denied James long-term disability benefits under the Policy's definition of disability applicable during the first 24 months of long-term benefit eligibility—inability to perform one's regular occupation. After 24 months of benefits, the Policy defines disability as the inability to perform "with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Docket #18-1, at 73.) "Any Occupation" is "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity" to perform. (*Id.* at 72.) Liberty argues that this Court should remand to Liberty consideration of James's disability under the second-tier definition of disability effective February 24, 2014.

"[R]emand to the plan administrator is appropriate 'where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he

18

was clearly entitled.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)). In *Welsch v. Wachovia*, 191 F. App'x 345 (6th Cir. 2006), the Sixth Circuit vacated and remanded a district court order awarding long-term disability benefits because the district court lacked a sufficient administrative record from which to review the plan administrator's determination regarding long-term benefits. *Id.* at 356. Similarly, in *Counsell v. Liberty Life Assur. Co. of Boston*, the district court remanded the case to the plan administrator for determination of whether the claimant was eligible for benefits under the second tier definition of disability. No. 08-14236, 2010 WL 1286695, at *6–7 (E.D. Mich. Mar. 31, 2010).

In this case, Liberty has only reviewed James's claim for benefits under the more inclusive "regular occupation" standard, not the "any occupation" standard. As such, Liberty has not considered what other occupations, if any, James may be able to perform. Thus, this case is distinguishable from cases with sufficient administrative records from which to draw the conclusion that a claimant has "clearly established" disability from any occupation. *Cf. Cooper*, 486 F.3d at 171. Therefore, although the Court will award James retroactive long-term disability benefits to February 24, 2012, the Court will remand consideration of James's eligibility beginning February 24, 2014 under the "any occupation" standard to Liberty for a full and fair review.

B.  **"Mental Illness Symptoms" Limitation**

The parties also dispute whether the Policy's "Mental Illness or Substance Abuse Symptoms Limitation" applies to James. The Policy states,

> The benefit for Disability due to Mental Illness Symptoms, unless hospitalized, will not exceed a period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

(Docket #18-1, at 86.) The Policy does not define "Mental Illness Symptoms," but defines "Mental Illness" as "a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness." (*Id.* at 75.)

In this case, Liberty has yet to review the record for whether James's condition falls within the 24-month limitation. The Court therefore finds that it is without a sufficient record to determine whether James's symptoms fall within the policy limitation. It will therefore remand this issue to Liberty for its consideration.

## V. Conclusion

For the reasons stated above, the Court will grant judgment in favor of James with respect to long-term disability benefits retroactive to February 24, 2012. However, it will remand to Liberty consideration of James's eligibility for benefits beginning February 24, 2014.


Dated: October 23, 2013                              /s/ Robert J. Jonker
                                                    ROBERT J. JONKER
                                                    UNITED STATES DISTRICT JUDGE